## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**CHANTEL MILLER & TYLER BORILL**          **CIVIL DOCKET NO. 6:22-CV-1681**
**ON BEHALF OF MINOR CHILD "W.B."**

**VERSUS**                                 **JUDGE DAVID C. JOSEPH**

**CITY OF CROWLEY, ET AL**                 **MAGISTRATE JUDGE JOSEPH**
                                           **H.L. PEREZ-MONTES**

### MEMORANDUM RULING

Pending before the Court is a MOTION FOR SUMMARY JUDGMENT (the "Motion") [Doc. 29] filed by Defendants the City of Crowley (the "City"), its Chief of Police, Allen James Broussard ("Chief Broussard"), and Crowley police officers Michael Smith ("Officer Smith"), Robyn Osborne ("Officer Osborne"), Josh McCrory ("Officer McCrory"), and Ryan Temple ("Detective Temple") (collectively, "Defendants").[1]  For the reasons that follow, Defendants' Motion is GRANTED.

### FACTUAL HISTORY

On February 18, 2022, Crowley police responded to a call from a concerned citizen, who had reported seeing a "teenage boy walking around with a rifle or a long gun shooting up in the trees or something" near the vicinity of 714 E. 12th Street in Crowley, Louisiana.[2]  The 911 caller stated that she had seen the boy "in several

---

[1]     Officer Alex Beed, also named as a defendant in this lawsuit, has not been served with the Amended Complaint and has not filed an Answer.  Thus, this ruling does not address the claims alleged against Officer Beed.

[2]     Affidavit of Rana Richard, attached as Exhibit A to Defendants' Motion for Summary Judgment [Doc. 29-5]; 911 Call Recording, attached as Exhibit A-1 to Defendants' Motion for Summary Judgment [Doc. 29-6].

different yards," as well as on the property of the Woodmen of the World insurance agency.  The caller characterized the situation as "concerning" to her.[3]  The area in question is a residential neighborhood in the heart of Crowley, Louisiana, less than two blocks from three local schools, namely Northside Christian School, St. Michael Catholic School, and Notre Dame High School.  At the time of the 911 call, these schools were dismissing for the day.[4]

According to the incident report of Detective Temple, in response to the call, every officer in the Crowley police patrol division and all other available officers responded to the area.[5]  Detective Temple, the highest-ranking officer to respond to the scene, suggested that the responding officers place themselves at the front of each of the three schools to watch as the students were dismissed.[6]  Detective Temple stationed himself at Northside Christian School, Officer Robyn Osborne stationed herself at Notre Dame High School, and Officer Smith stationed himself at St. Michael's.[7]

While standing guard at Northside Christian School, Detective Temple observed a "white male, holding a long gun in his hands," south of his location.[8]

---

[3]     911 Call Recording, attached as Exhibit A-1 to [Doc. 29-6].

[4]     Report of Detective Ryan Temple, attached as Exhibit P-1 to the Plaintiff's Memorandum in Opposition to the Motion for Summary Judgment.  [Doc. 33-5, ¶ 2].

[5]     *Id.* at ¶1.

[6]     *Id.* at ¶2.

[7]     *Id.* at ¶3.

[8]     *Id.* at ¶5.

Detective Temple instructed Officer Smith to proceed in the direction of where he had seen the suspect.[9]  Upon proceeding to the identified location, Officer Smith turned on his body camera video and observed a young male wielding what he believed to be a firearm in a wooded area behind a residence.[10]  The body camera video shows Officer Smith approaching the young man – later learned to be W.B. – and ordering him to "drop the gun," while simultaneously raising his own weapon and pointing it at W.B..[11]  Officer Smith's gun is raised for 1-2 seconds and is lowered as W.B. walks toward Officer Smith.[12]  W.B. told Officer Smith that he was playing with his BB gun, but immediately denied leaving his own yard and was unable to state his address when asked.[13]  He was able to point to his house, which was the house in front of the backyard where Officer Smith located him.[14]

The bodycam video shows that while Officer Smith communicated with other officers by radio, W.B. appeared disengaged and did not follow Officer Smith as instructed.  Officer Smith again warned W.B. to stay close to him as the two of them walked.[15]  Leaving W.B. with Detective Temple, who had arrived on the scene, Officer

---

[9]     *Id.*

[10]    Affidavit of Michael Smith, attached as Exhibit D to Defendants' Motion for Summary Judgment.  [Doc. 29-11, ¶ 6].  *See also* "Michael Smith Body Camera Video Footage" ("bodycam video" or "bodycam footage"), attached as Exhibit D-1 to Defendants' Motion [Doc. 29-12].

[11]    Affidavit of Michael Smith at ¶ 7.  *See also* bodycam video.

[12]    *See* bodycam video.

[13]    Affidavit of Michael Smith at ¶ 8. *See also* bodycam video.

[14]    *See* bodycam video.

[15]    *Id.*

Smith retrieved the gun, which had been dropped by W.B. upon command.[16]  After retrieving the BB gun, Officer Smith patted W.B. down and placed him in handcuffs, stating, "you are not being arrested, you're being detained ok … Alright … this is just procedure … like I said, you're not under arrest, you're just being detained."[17]  Officer Smith and Detective Temple, now joined by Officer Osborne and Officer McCrory, took W.B. to his mother, Chantel Miller, who asked W.B., "Where were you at?"[18]  At that point, the officers explained the seriousness of carrying a weapon near the schools before removing the handcuffs.[19]  Officer Osborne is seen comforting W.B., explaining that she knows the incident is scary, but telling W.B. that he scared a lot of people.[20]  The entire encounter, from the time that Officer Smith arrived on the scene to the time that W.B. goes into his house when the police are leaving, lasted a little more than nine minutes.[21]  W.B. was in handcuffs just over four minutes of this period.[22]

---

[16]     *Id.*

[17]     *Id.*

[18]     Affidavit of Michael Smith at ¶ 9.  *See also* bodycam video.

[19]     *Id.* at ¶ 10.  *See also* Exhibit D-1, "Michael Smith Body Camera Video Footage."

[20]     *See* bodycam video.

[21]     *Id.*

[22]     Plaintiff's allegation in her Amended Complaint that W.B. "remained handcuffed in his front yard surrounded by police officers, and squad cards, for no less than forty minutes" is contradicted by the video evidence.  *See* bodycam video.

## PROCEDURAL HISTORY

On June 16, 2022, Plaintiff Chantel Miller filed suit on behalf of her minor child, W.B., against the City and Chief Broussard, alleging civil rights violations under the Fourth and Fourteenth Amendments to the United States Constitution, and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988, as well as state law claims of battery, intentional infliction of emotional distress, and false imprisonment.[23]  On June 9, 2023, the Plaintiff amended her Complaint to add Officers Michael Smith, Alex Beed, Robyn Osbourne, and Josh McCrory, and Detective Temple as defendants.  [Doc. 26].  Plaintiff seeks damages for "great inconvenience, frustration, humiliation, embarrassment, loss of enjoyment of life and society, mental anguish and/or distress, past and future mental pain and suffering, grief, mental trauma, and medical expenses related to therapy and the continued need for therapy." [*Id.* at ¶ 46].  In her Amended Complaint, Plaintiff reiterates her claims against Chief Broussard and the City of Crowley and clarifies her Louisiana law claims to include a claim for aggravated assault for pulling a gun on W.B. in violation of La. Rev. Stat. § 14:37.4, intentional infliction of emotional distress, false imprisonment, and failure to intervene against the officers who did not protect W.B. [*Id.* at ¶ 25].

On September 5, 2023, Defendants filed the instant Motion for Summary Judgment [Doc. 29] seeking dismissal of all Plaintiff's claims.  Plaintiff opposed the Motion [Doc. 33], to which Defendants filed a reply brief.  [Doc. 34].

---

[23]     Although Tyler Borill's name appears in the caption of the Amended Complaint, Mr. Borill alleges no claims in the body of the Amended Complaint itself.

<u>**LAW & ANALYSIS**</u>

## I.   <u>Summary Judgment Standard</u>

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The movant bears the burden of demonstrating the absence of a genuine dispute of material fact but need not negate every element of the nonmovant's claim. *Hongo v. Goodwin*, 781 F. App'x 357, 359 (5th Cir. 2019) (citing *Duffie v. United States*, 600 F. 3d 362, 371 (5th Cir. 2010)). If the movant meets this burden, the burden then shifts to the nonmovant who is required to "identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). However, summary judgment cannot be defeated through "[c]onclusional allegations and denials, speculation, improbable inferences,

unsubstantiated assertions, and legalistic argumentation." *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017) (quoting *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002)).

In applying this standard, the Court should construe "all facts and inferences in favor of the nonmoving party." *Deshotel v. Wal-Mart Louisiana, L.L.C.*, 850 F.3d 742, 745 (5th Cir. 2017); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  The motion for summary judgment should be granted if the non-moving party cannot produce sufficient competent evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

## II.  Claims Against Chief Broussard and Officers in Their Official Capacities

Claims against Chief Broussard and the named Crowley police officers in their official capacities must be dismissed because they are redundant.  It is well-settled that a suit against a municipal official in his or her official capacity is simply another way of alleging municipal liability.  *Howell v. Town of Ball*, 2012 WL 3962387, at *4 (W.D. La. Sept. 4, 2012) (citing *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978)).  "When … the government entity itself is a defendant in the litigation, claims against specific individuals in their official capacities are redundant, and for that reason, courts in this circuit have found it is appropriate to dismiss them." *Broussard v. Lafayette City-Parish Consolidated Government*, 45 F. Supp. 3d 553, 571 (W.D. La. 2014) (first citing *Castro Romero v. Becken*, 256 F.3d 349,

355 (5th Cir. 2001); then citing *Flores v. Cameron County, Tex.*, 92 F.3d 258, 261 (5th Cir. 1996)).   In the instant case, the City of Crowley is named as a defendant, therefore, the claims against Chief Broussard and Officers Smith, Osborne, McCrory, and Detective Temple, in their official capacities, are redundant of the claims against the City of Crowley and are properly dismissed.

### III.   <u>Municipal Liability Under Section 1983</u>

Defendants also seek dismissal of Plaintiff's *Monell* claims against the City, arguing that the Plaintiff cannot identify a deficient training policy, practice, or custom that is causally related to the alleged constitutional injury.

Under § 1983, a municipality cannot be held liable under a *respondeat superior* theory, but it may be held liable when execution of a government's official "policy or custom" inflicts the injury.   *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 691, 694 (1978).   In this respect, a plaintiff must show that the municipality made a deliberate or conscious choice that resulted in the alleged injury.   *Goodman v. Harris County*, 571 F.3d 388, 396 (5th Cir. 2009).[24]

As a practical matter, "[t]o overcome summary judgment on a municipal liability claim, a plaintiff must … 'demonstrate a dispute of fact as to three elements that: (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right.'"   *Webb v. Town of Saint*

---

[24]   *See e.g.*, *Monell*, 436 U.S. at 694 (stating that municipal liability requires a policy maker; an official policy; and a violation of constitutional rights through a policy or custom); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (stating that isolated actions almost never trigger liability); *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (stating that § 1983 liability attaches where a deliberate choice to follow a course of action is made from various alternatives by policy makers).

*Joseph*, 925 F.3d 209, 214 (5th Cir. 2019) (quoting *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017), as revised (Mar. 31, 2017)).

Fifth Circuit jurisprudence provides three ways for a plaintiff to establish a municipal policy for purposes of *Monell* liability.

> First, a plaintiff can show "written policy statements, ordinances, or regulations."  Second, a plaintiff can show "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy."  Third, even a single decision may constitute municipal policy in "rare circumstances" when the official or entity possessing "final policymaking authority" for an action "performs the specific act that forms the basis of the § 1983 claim."

*Id.* at 214-15 (citations omitted).

Here, Plaintiff contends that a City is liable "when the execution of a government policy or custom inflicts the injury" for which the government is responsible and argues that the City adopted and endorsed the actions of the officers through its deliberate indifference [to] the treatment of a minor child.[25]  Plaintiff further alleges that the "City has liability under Section 1983 for failure [to] discipline both the Chief for his failure to properly train his officers, or for the officers who were using excessive force on a minor child."[26]  However, the Plaintiff identifies no written municipal policy of inflicting excessive force and has presented no evidence of a widespread practice of allowing the use of excessive force.  *See, e.g., Holman v. Fairchild*, 564 F. Supp. 3d 531, 539 (S.D. Tex. 2021) (district court denied the city's motion for summary judgment on plaintiff's *Monell* claims where plaintiff proffered

---

[25]     *See* First Amended Complaint for Damages [Doc. 26] at ¶¶ 30, 33, 34.

[26]     *Id.* at ¶ 37.

two expert reports to establish a widespread practice of excessive force by Houston police officers, which summarized multiple excessive force incidents involving specific individuals, a U.S. Department of Justice report detailing the use of excessive force in Harris County's jail, and a 2015 *Houston Chronicle* report investigating the use of excessive force in Harris County's jail).  Because the Plaintiff in this matter has proffered no evidence of a widespread practice of allowing the use of excessive force, the City is entitled to summary judgment on the Plaintiff's *Monell* claims.

## IV.  Claims Against Chief Broussard in His Individual Capacity

To the extent that the Plaintiff alleges claims against Chief Broussard in his individual capacity, these claims are dismissed.  The Fifth Circuit has held that, in a claim asserted under Section 1983, "[a] plaintiff must establish that the defendant was either personally involved in the deprivation or that his wrongful actions were causally connected to the deprivation." *James v. Texas Collin County*, 535 F.3d 365, 373 (5th Cir. 2008), *citing Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999).  Because there is no evidence that Chief Broussard was present or had any personal involvement in the incident, nor any evidence of a causal connection between any action of Chief Broussard and the alleged injury, all claims alleged against Chief Broussard in his individual capacity are dismissed.

## V.  Claims Against the Officers in Their Individual Capacities

Plaintiff argues that the force used by Officer Smith was excessive and violated W.B.'s clearly established constitutional right to be free from such force.  In addition, Plaintiff claims that the conduct of Officer Osborne, Officer McCrory, and Detective

Temple during W.B.'s detention was so egregious that these officers should each be liable for failing to intervene to protect W.B. from the use of excessive force. Defendants seek summary judgment dismissing Plaintiff's claims against the officers in their individual capacities on grounds they are all entitled to qualified immunity.

The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation." *Ashcroft v. Iqbal*, 556 U.S. 662, 685, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009) (internal quotations and citations omitted). A qualified immunity defense is thus "an immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

When reviewing a motion for summary judgment, the court must view all of the facts in the light most favorable to the non-moving parties and draw all reasonable inferences in their favor. But an assertion of qualified immunity alters the standard. Once qualified immunity is asserted, "the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Trammell v. Fruge*, 868 F.3d 332, 338 (5th Cir. 2017). Nonetheless, all inferences are

to be viewed by the Court in the light most favorable to the plaintiff.  *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

Important here, when there is video evidence, a court is not required to favor a plaintiff's allegations over the video evidence."  *Brown v. Coulston*, 463 F. Supp. 3d 762, 769 (E.D. Tex. 2020), *citing Hartman v. Walker*, 685 F. App'x 366, 368 (5th Cir. 2017) (citations omitted) (per curiam), *citing Scott v. Harris*, 550 U.S. 372, 380–81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).  *Accord Trammell v. Fruge*, 868 F.3d 332, 338 (5th Cir. 2017), *citing Hanks v. Rogers*, 853 F.3d 738, 744 (quoting *Curran v. Aleshire*, 800 F.3d 656, 664 (5th Cir. 2015) ("a plaintiff's version of the facts should not be accepted for purposes of qualified immunity when it is 'blatantly contradicted' and 'utterly discredited' by video recordings."); *Terrell v. Town of Woodworth*, No. 1:21-CV-04224, 2023 WL 4115769, at *6 (W.D. La. June 7, 2023), *report and recommendation adopted,* No. 1:21-CV-04224, 2023 WL 4115879 (W.D. La. June 21, 2023) ("Where there is a video recording of the events in question, the Court should analyze the video evidence and reject the plaintiff's account only where the video evidence so clearly discredits the plaintiff's story that no reasonable juror could believe the plaintiff's version of the events.").

In determining the application of qualified immunity, courts engage in a two-step analysis.  First, they assess whether a statutory or constitutional right would have been violated on the facts alleged.  *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004).  Second, they determine whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person

would have known.  *Id.* (citations and quotations omitted).  "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (citations and quotations omitted). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citations and quotations omitted).  The two steps of the qualified immunity inquiry may be performed in any order. *Pearson*, 555 U.S. at 236, 129 S.Ct. 808.

In excessive force cases, "the second prong of the analysis is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (citations and quotations omitted).  "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Id.*

The Supreme Court has explained:

"We have repeatedly told courts ... not to define clearly established law at a high level of generality...."

**The dispositive question is "whether the violative nature of** *particular* **conduct is clearly established."** ***Ibid.*** **(emphasis added).  This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"** *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (*per curiam* ) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine

how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."

*See Mullenix v. Luna*, 577 U.S. 7, 12, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (emphasis added) (some citations omitted).

In determining what constitutes clearly established law, this court first looks to Supreme Court precedent and then to Fifth Circuit precedent. *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018), *citing Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011). If there is no directly controlling authority, this Court may rely on decisions from other circuits to the extent that they constitute "a robust 'consensus of cases of persuasive authority.'" *Shumpert*, 905 F.3d at 320, *citing Morgan*, 659 F.3d at 372. Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established. This is true even when the circuit split developed *after* the events in question. *Morgan*, 659 F.3d at 372.

With the foregoing in mind, the Court addresses the Plaintiff's claims for individual liability against each police officer.

### a. *Claims Against Officer Smith in His Individual Capacity*

Plaintiff alleges that Officer Smith violated W.B.'s Fourth Amendment right to be free of the use of excessive force when he: (i) raised his gun to W.B., and (ii) when he handcuffed W.B. Under the qualified immunity analysis, the question before the Court is whether Officer Smith's actions in raising his gun and in handcuffing W.B. violated clearly established statutory or constitutional rights of which a reasonable person would have known.

Here, Officer Smith encountered an eleven-year-old boy who fit the description of the 911 caller; who stated that she had seen a young man "walking around with a rifle or long gun shooting up in the trees or something" in several different residential yards, near three schools as they were dismissing, and who described the behavior as "concerning."[27]  Once W.B. was located, he was compliant with Officer Smith when told to drop his gun and while being patted down, and was not an apparent threat to officer safety at the time he was handcuffed.  However, he was hesitant to follow Officer Smith as instructed and appeared disengaged during questioning.  While W.B. was in handcuffs, the officers continued to investigate the incident, but they did so quickly, taking W.B. to his mother to inquire about the matter.  The entire exchange took approximately 9-10 minutes, and W.B. was told on several occasions that he was not under arrest but that officers were just getting to the bottom of the situation.  The relevant inquiry is whether existing precedent establishes "beyond debate" that Officer Smith should not have raised his gun at W.B. or handcuffed him under these circumstances.  *Mullenix*, 577 U.S. at 11.

Given this scenario, the Court concludes that Officer Smith did not violate a clearly established constitutional right in raising his gun upon encountering W.B.  At that time, Officer Smith knew only that W.B. matched the description given by a 911 caller of a suspect who had a gun and had been seen wandering through several different yards near three schools.  Upon encountering W.B., Officer Smith saw the weapon in W.B.'s hand.  Plaintiff argues that the Crowley Police Department employs

---

[27]     *See* 911 Call Recording.

the "Plus One Concept" for the use of firearms and that per that policy, "[n]o police officer shall draw their Firearm unless there is a threat or probable cause to believe there is a threat to life."[28]   Plaintiff argues that because the schools were secure at the time Officer Smith drew his weapon, there was no longer a reasonable threat. But at the time Officer Smith drew his gun, he was facing an unknown person  who was holding what appeared to be a gun.  Although the schools were secure, *Officer Smith* was not secure until the "weapon" W.B. was holding was dropped. Furthermore, it was not until Officer Smith retrieved the weapon that he was able to confirm the "weapon" was a BB gun.  Thus, Officer Smith's command to drop the gun, and the raising of his own gun, did not violate any clearly established right of W.B. Officer Smith's actions were reasonable under the circumstances.

Next the Court considers whether Officer Smith's action of handcuffing W.B. violated a clearly established constitutional right.  The bodycam video shows that W.B. was handcuffed after Officer Smith retrieved the gun and immediately after W.B. was patted down.  Although the gun was in Officer Smith's possession at the time W.B. was handcuffed, W.B. was noticeably disengaged from the situation and did not follow Officer Smith as instructed on several occasions.  Additionally, there was a discrepancy between the 911 caller's report – indicating that the suspect had been shooting the gun into the trees and had been in several different yards – and W.B.'s responses to Officer Smith's questions about whether he had left his own yard. In order to resolve these discrepancies, Officer Smith and Detective Temple took W.B.

---

[28]    *See* Crowley Police Department Policies and Procedures, July 1, 2016, attached as Exhibit P-5 to Plaintiff's Opposition to Motion for Summary Judgment.  [Doc. 33-9, p. 75].

to his mother's residence, with Officer Smith placing W.B. in handcuffs before they did so.  Officer Smith informed W.B. that he was not being arrested, that he was only being detained,[29] and that the officers were attempting to resolve what the 911 caller had stated about W.B.'s location and what the officers themselves had observed.  Once Officer Smith was satisfied that W.B. posed no danger to the community, W.B. was unhandcuffed and the police left the scene.  The entire incident took approximately 9-10 minutes.

Specifically, the Court notes that none of the defendant police officers "harassed" W.B., nor did W.B. remain in handcuffs for 40 minutes, as alleged by the Plaintiff in her Amended Complaint.  The bodycam video clearly shows that Officer Smith told W.B. several times that he was not under arrest, that he was simply being detained while they questioned him and his mother, and that the police just needed

---

[29]    The circumstances of W.B.'s brief detention constituted a *Terry* stop.  A temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and may be undertaken only if the law enforcement officer has reasonable suspicion to believe that a crime has occurred or is in the offing.  *United States v. Flowers*, 6 F.4th 651, 655 (5th Cir. 2021), *cert. denied*, 142 S.Ct. 2707, 212 L.Ed.2d 778 (2022), *citing Terry v. Ohio*, 392 U.S. 1, 30–31, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968).  In *Smith v. Heap*, the Fifth Circuit held that it can be "reasonable to detain a suspect at gunpoint, handcuff [him], and place [him] in a police car" during an investigatory stop.  31 F.4th 905, 911 (5th Cir. 2022), *citing United States v. Thomas*, 997 F.3d 603, 615 (5th Cir. 2021) (citing *United States v. Abdo*, 733 F.3d 562, 565–66 (5th Cir. 2013), *cert. denied*, 142 S.Ct. 828, 211 L.Ed.2d 513 (2022).  As in *Smith*, the officers in this case detained W.B. for mere minutes and released him after they understood the situation and satisfied themselves that he was not a danger to the community.  Under these circumstances, and because reasonable suspicion supported the investigatory stop, the Court finds that there was not an unreasonable seizure in this case, nor was the force employed against W.B. excessive.

to know what had occurred that morning.[30]   Officer Smith declined to charge W.B. with any crime, and the entire incident was resolved in under ten minutes.

In arguing that Officer Smith's handcuffing of W.B. violated his clearly established constitutional rights, Plaintiff relies upon *Brown v. Coulston*. 463 F. Supp. 3d 762, 768 (E.D. Tex. 2020).  In *Brown*, the district court held that an officer who handcuffed a special needs student who was aggressive, full of uncontrollable rage, and noncompliant with an officer's commands was entitled to qualified immunity.[31]   Drawing a distinction between the facts of this case and *Brown*, the Plaintiff argues that because W.B. was unarmed, not aggressive, and compliant, Officer Smith is not entitled to qualified immunity.

Plaintiff's argument is misplaced for several reasons.  As the court stated in *Brown*,

> [The plaintiff] has not identified any precedent of the United States Supreme Court or this circuit confirming that Officer Coulston's actions violated "clearly established" law on excessive force under the Fourth Amendment.  Brown's failure to do so "dooms" her case against Officer Coulston. *See Vann*, 884 F.3d at 310 (affirming grant of summary judgment in officer's favor in an excessive force case when plaintiff failed to cite Supreme Court or Fifth Circuit precedent on applicable, "clearly established" law).

> To the contrary, precedent within this circuit shows the opposite—that there is no clearly established law that a police officer may not handcuff

---

[30]      *See* bodycam video.

[31]      In *Brown*, the actions of the minor child were described as follows: "T.B. violently resisted being restrained, including screaming, kicking, thrashing, spitting, and trying to hit his own head against the floor.  When handcuffed, T.B. pulled against the restraints, and, in one instance, T.B. attempted to pull his handcuffed hands through his legs.  T.B. repeatedly cursed at Officer Coulston and other school officials during this time and was plainly agitated and angry, even when he was told that his mother, Brown, was coming to pick him up."  463 F. Supp. 3d at 777.

or otherwise use his body weight to restrain a student, including a student who has special needs and is repeatedly disruptive, combative, noncompliant, and resisting the officer's commands. Courts in the Fifth Circuit have not squarely addressed what constitutes an objectively unreasonable use of handcuffs on a student. However, a number of decisions suggest that the restraint of disruptive, noncompliant students, including very young students and students with special needs, does not implicate the violation of constitutional rights.

*Brown*, 463 F. Supp. 3d at 777.

Similar to the analysis by the district court in *Brown*, in this case there is no clearly established law that a policer officer may not, during the course of an investigatory stop, briefly handcuff a juvenile who: (i) is in the vicinity of three schools at dismissal time; (ii) has been reported by a 911 caller for walking around several residents' yards with a gun, shooting up into the trees; (iii) is actually discovered by the police to be carrying what looks like a gun; (iv) tells a story about his recent whereabouts that is inconsistent with both the report of the 911 caller and police observations; and (v) is somewhat disengaged during questioning and fails to immediately follow Officer Smith as directed. In the absence of any precedential caselaw to the contrary, the Court concludes that under the facts of this case, there was no clearly established right that Officer Smith could not handcuff W.B. while police investigated his movements and activities during the incident. The Court further concludes that the actions of Officer Smith in handcuffing W.B. were within the bounds of reasonable behavior under the circumstances.

The Court further finds that, even if Officer Smith was not entitled to qualified immunity, the Plaintiff would ultimately be unable to prevail on the merits of her excessive force claim, as the Plaintiff has produced no evidence supporting her claim

for W.B.'s alleged injuries. To prevail on a Fourth Amendment excessive force claim under § 1983, plaintiffs must prove: "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Johnson v. Thibodaux City*, 887 F.3d 726, 731 (5th Cir. 2018), *citing Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004).

To establish the first element of an excessive force claim, a plaintiff must prove more than a *de minimis* injury. *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005). Although courts no longer require "significant injury" for excessive force claims, the injury must be more than *de minimis. Williams v. Bramer,* 180 F.3d 699, 703 (5th Cir.1999). "Any force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold, and, conversely, objectively reasonable force will result in *de minimis* injuries only." *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (citation and quotation marks omitted). Stated differently, "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Id.*

In *Tarver v. City of Edna*, the Fifth Circuit reaffirmed that handcuffing too tightly, without more, does not amount to excessive force. 410 F.3d 745, 752 (5th Cir. 2005), *citing Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001). The court further held that although psychological injuries can serve as a basis for § 1983 liability, the defendant police officers were entitled to qualified immunity where the plaintiff failed to produce evidence that he suffered psychological injury from the

handcuffing or that the handcuffing was excessive or unreasonable.  *Flores v. City of Palacios,* 381 F.3d 391, 400–01 (5th Cir. 2004),

Here, the Plaintiff does not allege any degree of physical harm greater than *de minimis* from the handcuffing and fails to proffer evidence supporting her claim that W.B. suffered psychological injury from the handcuffing.  In the absence of such evidence, the Court finds that the Plaintiff's excessive force claim would also fail on the merits.

### b.  *Claims Against Detective Temple, Officer McCrory, and Officer Osborne in Their Individual Capacities*

Defendants seek summary judgment dismissal of the claims against Detective Temple, Officer McCrory, and Officer Osborne in their individual capacities on grounds they are entitled to qualified immunity.  The Plaintiff does not oppose or otherwise controvert Defendants' argument that these defendants did not exert any force, much less excessive force, during the incident, and these claims are therefore subject to dismissal.

To the extent the Plaintiff asserts that Officer McCrory, Officer Osborne, and Detective Temple are liable as bystanders who did not protect W.B., the Court has already determined that W.B.'s constitutional rights were not violated during his brief detention by Officer Smith.  Considering the foregoing, Officer McCrory, Officer Osborne, and Detective Temple are likewise entitled to qualified immunity.[32]

---

[32]      Plaintiff does not allege that any of these officers otherwise used excessive force against W.B.

**VI.**   **Punitive Damages/Attorneys Fees**

In her Amended Complaint, Plaintiff seeks punitive damages against the defendant officers under 42 U.S.C. § 1983 as well as attorneys' fees under 42 U.S.C. § 1988.  As an initial matter, the Court notes that a party must be a prevailing party in a civil rights suit to recover attorney fees under 42 U.S.C. § 1988.  *Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir. 1990), *citing Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1938, 76 L.Ed.2d 40 (1983).  Because the Plaintiff is not a prevailing party on her claims against the defendants, she is not entitled to attorneys fees under Section 1988.

Furthermore, punitive damages may be awarded for a violation of a plaintiff's constitutional rights only when the defendant's conduct "is 'motivated by evil intent' or demonstrates 'reckless or callous indifference' to a person's constitutional rights." *Williams v. Kaufman County,* 352 F.3d 994, 1015 (5th Cir.2003) (citation omitted). Thus, a plaintiff is entitled to punitive damages only if she prevails on the merits of her claim and the finder of fact determines that the defendant's conduct was motivated by reckless or callous indifference. "Reckless indifference has been described by the Supreme Court as 'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (citation omitted). Because Plaintiff's claims fail for the reasons discussed above, she is not entitled to punitive damages in this matter, and in any event, the Court finds no evidence of

reckless indifference or callous disregard.  For these reasons, the Plaintiff's claim for attorneys fees and punitive damages is dismissed.

## VII.   Underline State Law Claims

As an initial matter, the Court notes that district courts have "supplemental jurisdiction" over claims so related to a federal question "that they form part of the same case or controversy," 28 U.S.C. § 1367(a). *Rodriguez v. Pacificare of Texas, Inc.*, 980 F.2d 1014, 1018-19 (5th Cir.), *cert. den.*, 508 U.S. 956 (1993); *Whalen v. Carter*, 954 F.2d 1087, 1097 (5th Cir. 1992).  Thus, this Court has jurisdiction over the Plaintiff's state law claims of assault and battery, intentional infliction of emotional distress, and false arrest and false imprisonment.  Significantly, Plaintiff does not oppose the Defendants' motion seeking dismissal of the Plaintiff's state law claims. For this reason, and because the Court finds that these claims are not supported by the evidence in the record, the Plaintiff's state law claims are dismissed, as follows.

### a.   *Assault and Battery*

"Under Louisiana law, the torts of assault and battery, when raised against a law enforcement officer acting in the course of employment, require a showing that the law enforcement officer acted with unreasonable or excessive force."  *Id.* at 515, *citing Gerard v. Parish of Jefferson*, 424 So.2d 440, 444 (La. App. 5 Cir. 1982); *see also Taylor v. United States*, 1991 WL 280066 (E.D. La. Dec. 19, 1991) ("Under Louisiana law, in the absence of the use of excessive force, a law enforcement officer cannot be held liable for assault and battery if the assault and battery occurred during a lawful arrest.").  The Fifth Circuit has stated that "Louisiana's excessive force tort mirrors

its federal constitutional counterpart." *Deville v. Marcantel*, 567 F.3d 156, 172–73 (5th Cir. 2009).

Accordingly, Plaintiff's assault and battery claims are essentially state law corollaries of her § 1983 claims for excessive force. As such, the analysis of Plaintiff's § 1983 excessive force claims against Defendants in their individual capacities also applies to Plaintiff's state law claims for assault and battery. These state law claims are therefore dismissed.

### b.   *Intentional Infliction of Emotional Distress*

In order to recover for intentional infliction of emotional distress under Louisiana law, the plaintiff has the burden of proving: (1) that the conduct of the defendants was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendants desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from their conduct. *White v. Monsanto Co.,* 585 So.2d 1205, 1209–10 (La.1991); *Deus v. Allstate Insurance Co.,* 15 F.3d 506, 514 (5th Cir.1994). The conduct complained of must be so outrageous in character and so extreme in degree that it goes beyond all possible bounds of decency and is regarded as utterly intolerable in a civilized community. *Id.* Liability arises only where the mental suffering or anguish is extreme, and the distress suffered must be such that no reasonable person could be expected to endure it. *White,* 585 So.2d at 1210.

In resolving the Plaintiff's claims for intentional infliction of emotional distress, the Court must review the evidence and the record taken as a whole in the

light most favorable to the Plaintiff and draw all reasonable inferences in the Plaintiff's favor.  In this case, the Plaintiff has alleged only psychological injuries as a result of the actions of the officers.  However, the Plaintiff has not submitted any medical records substantiating any psychological injuries, nor has she even argued that W.B. has undergone mental health treatment or counseling.  Thus, even assuming that the first and third elements can be established, the Plaintiff has produced no relevant evidence establishing a genuine issue of material fact with regard to the alleged severe emotional distress.

For the foregoing reasons, the Court finds that there is no genuine issue of material fact regarding whether the Plaintiff has suffered from "severe" emotional distress.  Accordingly, her state law claim for intentional infliction of emotional distress must be dismissed.

### c.    *Negligence*

State-law tort claims against law enforcement officers "are analyzed under general negligence laws, which employ a duty-risk analysis."  *See Williams v. Champagne*, 13 F. Supp. 3d 624, 634-35 (E.D. La. 2014), *citing Manis v. Zemlik*, 96 So.3d 509, 513 (La. App. 5th Cir. 5/8/12), *writ den.*, 98 So.3d 852 (La. 10/8/12); *Stroik v. Ponseti*, 699 So.2d 1072, 1077 (La. 1997).  "The duty-risk analysis consists of the following factors: (1) did the defendant owe a duty to the plaintiff; (2) was the duty breached; (3) was the conduct in question a substantial factor in bringing about the harm to the plaintiff, *i.e.*, was it a cause-in-fact of the harm which occurred; (4) was the risk, and harm caused, within the scope of protection afforded by the duty

breached; and (5) actual damage." *Tutrix on behalf of DCJH v. Travis*, 595 F. Supp. 3d 488, 513 (M.D. La. 2022), *citing Williams v. Domino's Pizza, Inc.*, 2001 WL 6724, at *4 (E.D. La. Jan. 2, 2001); *Roberts v. Benoit*, 605 So.2d 1032, 1041 (La. 1991); *see also Wiltz v. Bayer CropScience, Ltd. P'ship*, 645 F.3d 690, 698 (5th Cir. 2011).  To impose liability, Plaintiff must prove all five factors.  *Id.*

 [U]nder Louisiana law, a police officer has a duty to act reasonably under the totality of the circumstances." *Tutrix on behalf of DCJH*, 595 F. Supp. 3d at 513, *citing Mathieu v. Imperial Toy Corp.*, 646 So.2d 318, 325 (La. 11/30/94).  Given that the Court has determined that the individual officers acted reasonably under the circumstances of this case, the Court finds that the officers are entitled to summary judgment on the Plaintiff's state law negligence claim.

CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that the MOTION FOR SUMMARY JUDGMENT [Doc. 29] filed by Defendants the City of Crowley, Chief Allen James Broussard, Michael Smith, Robyn Osborne, Josh McCrory, and Ryan Temple is GRANTED, and all claims of the Plaintiff against these defendants, in both their official and individual capacities, are DENIED AND DISMISSED WITH PREJUDICE.

THUS, DONE AND SIGNED in Chambers on this 13th day of October 2023.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE